682

ENGINEERING & RESEARCH CORPORA-
TION et al. v. HORNI SIGNAL COR-
PORATION. *

HORNI SIGNAL CORPORATION v. AU-
TOMATIC SIGNAL CORPORATION.

Nos. 386, 387.

Circuit Court of Appeals, Second Circuit.
July 25, 1938.

Clifton V. Edwards and D. Gordon
Angus, both of New York City, for Auto-
matic Signal Corporation.

Pennie, Davis, Marvin & Edmonds, of
New York City (Daniel V. Mahoney, of
New York City, of counsel), for Horni
Signal Corporation.

Before MANTON, L. HAND, and AU-
GUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These appeals come up from decrees in
two separate suits. The first was brought
by the Automàtic Signal Corp'n against the
Horni Signal Corp'n upon a patent to Nel-
son, which was reissued after his death on
application of the plaintiff, as assignee. It
was concerned with the automatic control
of signal lights at the meeting of two roads,
to regulate the passage of motor cars.
Thirty-five of the sixty-three claims are in
suit, of which the judge held twelve valid
and infringed, and twenty-three invalid.
Both sides appeal from this decree. The
second suit is by the Horni Signal Mfg.
Corp'n against the Automatic Signal Corp'n
upon claims 1, 2 and 5 of a patent to Ram,
which was for the same general purpose.
These claims the judge held not infringed,
without passing on their validity. The
Engineering & Research Corp'n holds the
title to Nelson's patent, and the Automatic
Signal Corp'n is its exclusive licensee;
it will be more convenient, however, to
speak of the Automàtic company as though
it were the owner.

Nelson's invention was to be used at the
meeting of a highway and a cross-road
where the traffic lights always showed
"high-way green" and "cross-road red",
unless a cross-road car approached: that
is, at a crossing where the highway normal-
ly had the right of way. Should a cross-
road car appear, these lights must change
so as to give it the right of way, and the
same must hold true of the next cross-road
car, and so on in succession. On the other

*Writ of certiorari denied 59 S.Ct. 149, 83 L.Ed. —.

hand, a string of such cars must not keep the right of way from the highway indefinitely. Some alternation of lights was necessary, and Nelson set a maximum period for "cross-road green", after which it yielded to "highway green", whether or not other cross-road cars were at ·hand. But this was not all: a cross-road car, when the light turned against it, might be left in such a position that it would never get its right of way until another cross-road car appeared. Therefore at the end of a predetermined period "highway green" must in turn yield to "cross-road green", if a cross-road car was waiting. This last feature was called the "lock-in", because the cross-road car, so caught at the turn of the light, had earlier imparted to the system an "impulse"—as will appear— which was "locked in" during the period of "highway green". All these objects Nelson achieved by a mechanism too complicated to be intelligible without the accompanying figures: we must content ourselves with the outlines. He set a trip on the cross-road far enough from the crossing for the light to change before a car reached it. When the wheels pressed this trip, it closed a circuit, and a solenoid in it pulled down an arm that closed another circuit, that arm being locked by a dash-pot. This second circuit set in revolution a "timer", a drum with alternate sectors of conducting and non-conducting material. When at rest the brush of the lighting circuit for "highway green" touched a conducting sector of this drum, and a brush of the "cross-road green", a non-conducting sector; but after it had turned a few degrees the "cross-road green" circuit was completed and the "highway green" circuit was cut out. Then the lights changed. However, as soon as the dash-pot was exhausted, the second circuit was broken, and the "timer" ceased to revolve. Since it revolved against a spring, the spring then began to operate, and snapped back the drum to its initial phase—"highway green". If, however, a second car passed the trip before the dash-pot was exhausted, the solenoid of the first circuit would again pull down the arm and fill the dash-pot once more. A close succession of cars would thus prevent the spring from snapping back the "timer", and the light from changing back to "highway green". All this while, however, the drum continued to revolve, and in due time—"the predetermined maximum"—the brush of the "cross-road green"

circuit would reach an insulated sector, and that of the "highway green" circuit a conducting sector, and the lights would then give the right of way to the highway. This fulfilled all of Nelson's objects except one. He had provided that a cross-road car, nearing the highway, should automatically secure the right of way, and that a succession of such cars should keep it; he had also provided that the cross-road should yield the right of way after a period measured in seconds. But he had failed to provide for a cross-road car, which, having passed the trip before the lights changed, was caught by a change of light before it could cross the highway. In terms of his mechanism, he had not provided for the case where the "timer" changed its phase before the dash-pot had been exhausted. That car must get the right of way without waiting for the advent of a new cross-road car; in other words, there must in that situation also be a predetermined period for "highway green". To do this Nelson provided a solenoid in parallel with the "highway green" circuit, which, if the arm that made and broke the second circuit was within reach of a latch, controlled by the solenoid, held down the arm as long as the "highway green" circuit remained closed. The second circuit, being thus maintained, continued to turn the "timer" so that the "highway green" had its phase, measured in seconds, like "cross-road" green. When that phase ended, "highway green" yielded to "cross-road green", and the standing car had the right of way for the period it took the dash-pot to be exhausted, after which the second circuit was broken and the "timer" would snap back. (This mechanism apparently would not operate, unless when the "highway green" circuit was closed, the latch could catch the arm. If the dash-pot had been then so far exhausted that the arm had risen above the latch, it is hard to see how the "impulse" could be "locked-in". However, we disregard this· difficulty.)

Nelson's disclosure was never used; so far as appears it was quite valueless until sublimated into the vastly more complicated train of mechanism installed by both parties to the suit. It is not necessary to attempt any description of this, and it would be even more difficult than the disclosure of the patent. It did fulfill the same objects as Nelson; that is, it gave the right of way to a car approaching on the cross-road, and to a succession of such

cars; it gave back to the highway the right of way after they had passed; it cut short the right of way of the cross-road after a predetermined maximum, measured in seconds; and finally it provided for a termination of "highway green" when a car had lost its right of way between the trip and the crossing by a change of light. Thus it did "the same things", but it did not do them in "substantially the same way"; it did not do them in anything like the same way. It had a single trip on only the cross-road, it is true, and a circuit, broken, instead of made, by the trip. It had a second circuit which actuated a solenoid which turned a shaft that changed the lights. But from there—strictly from before that point—the whole mechanism was different from Nelson's, and Nelson gave no cue to its extremely intricate design. If the claims are to cover it, they must therefore be read broadly upon any installation which shall in any way accomplish all that Nelson accomplished. The claims are so general and functional that verbally there can be no reasonable doubt that the defendant infringed them; indeed it scarcely disputes that it does; it says that they are invalid. The fact that they are functional need not be conclusive against them; most claims are so, more or less. Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775, 782, 783; Buono v. Yankee Maid Dress Corp., 2 Cir., 77 F.2d 274, 277. But when a patentee draws his claims in that form, he must be content that they shall be limited at least by such details of the disclosure as are necessary to save the patent. In the case at bar Nelson did think out in detail all that was necessary to a satisfactory automatic control of traffic at a street crossing by means of signals, when the tripping devices are set back from the crossing. Possibly that of itself demanded an inventor's gifts; we may assume as much arguendo, and if so, his claims just as they read would have been good, if not anticipated. Often it requires more imagination to do that than to design the mechanical means by which the different requirements are to be embodied. The difficulty in the case at bar is that Nelson was not the first to think the problem through; Ram preceded him as we shall show, and Nelson's claims, to be valid, must be understood to incorporate some details of his disclosure.

■ Ram's patent appeared ten days after Nelson filed his application, but it had been nearly four years in the Office, and was admittedly prior art. It did not assume that either of the roads had normally the right of way, and it was therefore necessary for a car on either road to actuate a trip in order to get its light, unless an earlier car on that road had already set it. Thus there were trips on both the highway and the cross-road. Moreover, on each there was a "check-in" trip and a "check-out" trip. When the fore wheels of a "cross-road" car touched the "check-in" trip, it mechanically completed a circuit which changed the light to "cross-road green", if it had stood at "highway green". (Ram in fact disclosed an indicator which changed through 90°, but we shall describe his invention in terms of lights, since these are inter changeable.) As the hind wheels of the car hit the trip, the mechanical means was withdrawn, and although the circuit was left closed, it was in such condition that the making of a second circuit would open it. When the fore wheels touched the "check-out" trip, they closed this second circuit which opened the first circuit. This did not of itself change "cross-road green" to "highway green"; what it did do was to make it possible for a car coming upon the highway to give itself "highway green", when it reached its own "check-in" trip. If nothing more had been provided, a succession of cross-road cars would have kept the "cross-road green" indefinitely, because although the circuit closed by each would be opened as it passed its "check-out" trip, the next car would close an adjacent circuit, unless before its arrival at the "check-in" trip and after its predecessor's passage over the "check-out" trip, a highway car had chanced to pass the highway "check-in" trip. To avoid this and give to the highway its own right of way, Ram provided for a momentary interruption of the lighting circuit by the fourth car regardless of the fact that a fifth cross-road car, just behind it, had already passed the cross-road "check-in" trip. This interruption served to give the right of way to the highway, provided a car had at that time passed the highway "check-in", and was waiting to pass the crossing. If no such car was present, four more cross-road cars could pass the crossing before the highway got the right of way. If the fifth car was

caught between its "check-in" and its "check-out", its "cross-road green" circuit remained unbroken, and would assert itself, as soon as the highway car had passed its "check-out". Thus its "impulse" was "locked-in" through the phase of "highway green". The plaintiff raised some objections to this disclosure, but it seems to us that they are more captious· than real. Ram did not indeed disclose trips for cars going in both directions, and the plaintiff's expert said that there were serious difficulties involved in arranging for them, but we do not understand that these went beyond the possibility that the cross-road might hold the right of way until a varying number of cars from one to eight had passed in both directions. However that may be Ram was operative, for at least it could be installed upon two one-way streets; as a reference it therefore is good enough if it covered the ground. We think it did. (1) Nelson provided for a cross-road car's getting the right of way from the highway. So did Ram. (2) Nelson provided that the light should change back after one such car had passed unless another. followed at once. Ram did not so provide, for apparently he did not wish his highway to have any preference, and in that he may have judged better, because Nelson compelled his cross-road cars to wait for the full phase of "highway green" to pass, though there were no highway cars to pass. But there is nothing in this difference anyway, because Ram itself contained the solution. In adapting his system to a railway, he provided a spring which always gave a "cross-road red" which would yield when no train was approaching. (Page 5, lines 128-130, page 4, lines 1-3; Figure 8.) Such a spring, used at a meeting of cross-road and highway, would keep the "highway green" always showing when there were no cars on the cross-road, though it would not dispense with the need of highway trips without rather radical reconstruction. (3) Nelson provided that if a second cross-road car followed the first so ′close that the "impulse" of the first had not disappeared—the dash-pot had not been exhausted—"cross-road green" should endure. So did Ram. (4) Nelson provided that the succession of cross-road cars could not be indefinite; the cross-road must yield the right of way to the highway. So did Ram. The plaintiff argues at length that there is important difference between measuring the interval during which the cross-road should have the right of way by cars, and by seconds; but this does not seem to us significant. Ram's period had to be short. The three cars following the first which had gained the light, must be so close together that one was always at the "check-in" trip before the other had passed the "check-out". If not, a car on the highway would get the right of way. Thus there was a maximum of short duration, though it was not "predetermined" in seconds. At any rate it did not demand invention—especially in the light of the short interval between Ram and Nelson and the absence of any intermediate efforts—to substitute such a maximum for one predetermined by a close succession of four cars. The mere timing of an automatic signal was not new. Nearly fifty years ago one, Potter (Patent No. 501,438), disclosed an automatic railway signal, planned to ring for a period measured much like Nelson's. He provided discs, part of conducting material and part of non-conducting, whose rotation threw in and out a circuit which sounded the signal. This patent was not indeed an anticipation standing alone, but it covered this detail in which Nelson was a variant of Ram. (5) Nelson provided a "lock-in" by which the dash-pot was held through the phase of "highway green". So did Ram, since as soon as a highway car had passed its "check-out," the "cross-road green" circuit earlier completed by the waiting cross-road car, would assert itself. Thus it appears to us that in the sequence of steps Ram was an anticipation. We need not for this reason declare the claims invalid and we do not: it is conceivable that some one may find valuable what was really new in Nelson's disclosure. If so, perhaps the claims may be so limited as to cover such an infringer. But it is essential that some details of the disclosure which alone was a contribution to the art, must be read into them; broadly taken they would be invalid. We will reverse the decree, and hold them all not infringed.

The second suit in on the Ram patent itself. All three of the claims in suit are verbally too limited to cover the plaintiff's installation; claim one says that the signals shall be so controlled that "no more that a predetermined number of vehicles may pass" before cars approaching on the other street get the right of way. Claim two is in substance the same, and so is claim five, except that it is confined to elec-

trically controlled mechanisms and car operated switches. If these claims are to cover the plaintiff's installation, the phrase, "a predetermined number of vehicles may pass in one direction", must be read as the equivalent of "a predetermined number of seconds must pass". The defendant says that they should be so read, claiming for Ram the place of a pioneer. We cannot concede it such a place. It is the merest paper patent, like Nelson's. True there is no evidence that anyone before Ram had ever worked out the different requirements of an adequate system of automatic signal control at a crossways. But we do not know when this became desirable, or how generally it has been adopted: nor do we know what others, if any, had tried it and failed. A patent does not become a pioneer merely because it is the first; some needs are so simple that they are answered directly they appear. We should have to have a stronger showing before we remade the claims which Ram was content to accept, and allowed him to cover the whole art.

Decree in the first suit reversed; bill dismissed for non-infringement.

Decree in the second suit affirmed.

Neither side will have costs, and the printing disbursements will be divided.