**KATZ v. HORNI SIGNAL MFG. CORPORATION.**

District Court, S. D. New York.

Aug. 14, 1943.

Henry L. Burkitt, of New York City (A. D. Caesar and Charles W. Rivise, of Philadelphia, Pa., of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Daniel V. Mahoney, of New York City, of counsel), for defendant.

454

LEIBELL, District Judge.

This is a suit based on the alleged infringement by defendant, Horni Signal Manufacturing Corporation, of patent No. 1,992,214 for an invention in traffic detectors, issued by the United States Patent Office to plaintiff, David Katz, on February 26, 1935, on an application filed November 12, 1928. The invention uses the principle of electro-magnetic induction (Faraday)— that when a magnetic field and an electrical conductor are moved relative to each other, an electro-motive force is induced in the conductor, causing a current to flow therein. Plaintiff discovered, after experimenting, that an iron clad vehicle, such as an automobile, moving on a highway, acts as a moving magnetic field, and if allowed to pass over or close to an electrical conductor (such as a large rectangular coil of wire in the highway) it will induce in the coil an electromotive force; that if the conductor is part of a closed circuit the E.M.F. will cause a current to flow which "may be led through a sensitive relay and reinforced sufficiently to close an electric contact or perform any other function whatsoever". Thus the device for detecting the presence of the moving automobile and reporting it conceivably might be used as an element in a traffic signal system of the vehicle-actuated type. Plaintiff's suit does not involve the traffic signal system. It relates solely to invention for detecting and reporting the presence of the moving automobile at a point in the highway.

The bill of complaint was filed March 31, 1941. It contains the usual prayer for an injunction, an accounting and damages. Defendant answered May 19, 1941. In addition to putting in issue the charge of infringement, defendant's answer attacked the validity of the Katz patent and pleaded many special defenses.

By a notice dated September 18, 1941, addressed to plaintiff's attorneys, they were requested to "state the claim or claims on which the plaintiff will rely in support of the charge of infringement". To this notice they replied: "Plaintiff will rely on claims 1, 2, 7, 10, 11 and 12 of Patent No. 1,992,214 in support of the charge of infringement." Towards the end of the trial plaintiff decided to elect claims 7 and 11 for the purpose of this suit. Defendant's attorney moved to dismiss claims 1, 2, 10 and 12 with prejudice. I reserved decision until the end of the suit. There is no good reason for granting defendant's motion and there are many that can be urged against it. It would only serve to complicate matters and might at some later date adversely and unjustly affect this litigation or other suits of the patentee. I think I should follow a more careful course, such as that pursued by the Circuit Court of Appeals, Second Circuit, in Engineering & Research Corp. v. Horni Signal Corp., 98 F.2d 682, at page 685, where, in the face of partial anticipation, the Court refused to declare the claims of a patent invalid, although "broadly taken they would be invalid", and limited itself to a holding that the claims were not infringed. Defendant's motion is accordingly denied. The legal effect of plaintiff's move is a withdrawal of certain claims from consideration by the Court. It amounts to an amendment of the pleadings. It does not appear necessary to dismiss claims 1, 2, 10 and 12, even without prejudice, as was done in Ford Motor Co. v. Gordon Form Lathe Co., 6 Cir., 90 F.2d 999. Further, it should be remembered that claim 1 as limited by claim 7, and claim 10 as limited by claim 11, are still in the case.

During the trial defendant raised a question as to the absence of the licensee (Automatic Signal Corporation) as a party plaintiff. It appears by exhibits 3 and 4— agreements dated May 15, 1936, and June 2, 1936, that plaintiff Katz, the patentee, granted an exclusive license to Automatic Signal Corporation. By letter dated March 14, 1939 (Ex. 12), sent by the licensee to the patentee, the exclusive license was terminated as of May 15, 1939, pursuant to the provisions of paragraph (a) of Section 3 of the agreement of May 15, 1936. The licensee by its letter of March 14, 1939, reserved "the right to a non-exclusive license under the provisions of Section 7 of the said agreement". This action for patent infringement, by Katz v. Horni Signal Manufacturing Corporation, was instituted on March 31, 1941, at which time there was no exclusive licensee of the patent in suit. The decisions in Independent Wireless Tel. Co. v. Radio Corp. of America, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357, and Deitel v. Chisholm, 2 Cir., 42 F.2d 172, do not apply.

The theory of plaintiff's invention is described in the patent specifications as follows: "My invention is based on the theory, that vehicles of the automobile type carry along with them, as they travel, a magnetic field. This effect is undoubtedly due to the fact that the earth itself is a

magnet, and that modern vehicles of the automobile type contain in their structure considerable quantities of iron. However, whatever the explanation, I verified my theory by experiment, and found that when an automobile type vehicle moves, it carries with it a distortion of the earth's normal magnetic field. This distorting of the earth's magnetic field, traveling along with each vehicle, I utilize in various ways to perform the registration above referred to."

Further on in the specifications we read the following:

"In Figs. 5 to 17 incl. I make use of the principle of electromagnetic-induction. I have indicated above that when an iron clad vehicle moves it carries with it a disturbance or distortion in the earth's magnetic field. This disturbance has the same effect as a moving magnetic field. Consequently, if allowed to pass over a conductor it will induce therein an E.M.F., and if the circuit is closed it will cause a current to flow."

"While I have shown the utilization of the earth's natural magnetic field, it will be clear that the same may be reinforced by placing a permanent magnet or an electro-magnet in proximity to the road in such a manner as to reinforce the earth's field. In fact one may create an artificial magnetic field so strong as to render the earth's field negligible in comparison therewith."

The only claims of the patent involved in the determination of the issue of infringement are the following:

Claims:

"1. In combination with a roadway designed for automobile type traffic, an indicator; an electric circuit; a conductor in said circuit, said conductor being situated in proximity to the path of the traffic and in position to be traversed by the disturbance of the earth's magnetic field normally attending the passage of an automobile over the roadway with a resultant induction of an electromotive force in said circuit; and means responsive to said electromotive force to operate said indicator."

"7. A combination as in claim 1, said circuit containing no sources of electrical energy."

"10. In combination with a roadway designed for automobile type traffic, an indicator; an electric circuit; a coil of wire in said circuit, said coil of wire being situated in proximity to the path of the traffic and comprising a plurality of loops connected in series and surrounding a normally constant magnetic field; said loops being disposed in interlinking relation to said magnetic field, whereby to be traversed by magnetic disturbances of said field normally attending the passage of an automobile over the roadway, with a resultant induction of an electromotive force in said circuit and means responsive to said electromotive force to operate said indicator."

"11. A combination as in claim 10, said circuit containing no sources of electrical energy."

Under the defense of anticipation defendant cited in its answer seventeen United States patents, one British patent and one German patent, all alleged to have anticipated plaintiff's invention. However, at the trial, defendant relied only on patent No. 470,923, issued to T. A. Edison March 15, 1892; patent No. 541,719 to C. M. Clark, issued June 25, 1925; patent No. 1,302,345 to G. P. Finnigan, issued April 29, 1919; and page 261 of a publication by S. B. Starling entitled "Electricity and Magnetism" published by Longmans Green & Co., New York and London, Fourth Edition, January 1924, as anticipating all the claims in suit.

The Edison, Finnigan and Clark patents had been cited by the Examiner in the patent office when he rejected claims 51, 52 and 53, which later became claims 10, 11 and 12 of the patent. The issue of whether or not those patents anticipated plaintiff's invention was then placed squarely before the Board of Appeals of the Patent Office. They are discussed in its opinion of December 6, 1933, from which I quote as follows:

"The patent to Clark shows an assemblage of elements quite similar to that employed by appellant for his particular purpose. Clark proposed to dispose a coil of wire at some point in a room or building where its field would be disturbed by the passage of a person into or through the building. The apparatus was primarily designed to detect the presence of a burglar. Some consideration was given to the fact that the burglar would probably have metal upon his body and that his movements would therefore modify the magnetic field of the coil, which magnetic field was produced by placing a battery in the coil circuit. Provision was made for shunting this battery during parts of the day when it was not desired to have the alarm operative.

Clark, like appellant, proposed to utilize the currents set up by disturbance of the field to operate signal mechanism through a sensitive relay in the form of a galvanometer.

"Appellant strongly contends that the Clark apparatus was inoperative in the manner and for the purpose described. At a demonstration given on the day of hearing, appellant satisfactorily established that a coil such as shown by Clark would not be appreciably affected by the movement of a person in its field. He also established that it would be but little affected by the movement of a considerable mass of iron such as might be carried by a burglar through the field. However, presumably any effect could be detected by sufficiently sensitive detecting apparatus, through doubtless with the apparatus available when Clark proposed his arrangement, the devices would have been inoperative, at least in the manner described in the patent."

Clark described his invention as follows: "The invention consists principally of an electric circuit, containing a magnetic coil to influence the electric current, by a person moving toward or from said coil, a galvanometer arranged in said circuit, and an alarm controlled by the said galvanometer."

The operation of the Clark invention is explained in the specifications as follows: "It is understood that a person moving toward one of the coils C, changes the activity thereof, so as to cause a deflection of the needle of the galvanometer E in one direction, to close the circuit for the circuit F and sound the alarm G."

According to his specifications, Clark's conductor, the magnetic coil C, is in an electric circuit. A, "supplied with electricity from a batttery B or other suitable means."

Plaintiff's claims 1 and 10 as limited respectively by claims 7 and 11 clearly eliminate the presence of any source of electrical energy in the conductor circuit, other than that induced in the conductor (coil) by the passing automobile. At the end of the trial plaintiff based its case on those two claims (No. 7 and No. 11), so as to keep as far away as possible from the disclosures of the Clark patent.

Concerning the Finnigan patent the Board of Appeals wrote: "The patent to Finnigan shows a signaling system embodying numerous expedients for producing a flow of current to the signal upon the passage of a car along a track section which is signal-equipped. Fig. 9 discloses an arrangement embodying two coils threaded by a magnetic field which is modifiable by the passage of a car along the track. Finnigan's arrangement operates by affording a closed metallic flux path for the lines of force which thread the coils. It is not at all clear that an expedient such as disclosed and described by Finnigan would suggest to one desiring a detecting apparatus for automobiles, a workable scheme. One considering the Finnigan patent might reasonably assume that for a passing vehicle to operate a signal it would be necessary for the vehicle to actually complete a metallic circuit path, a condition not readily obtainable in the automobile detection art."

Defendant's expert, Squire, admitted at the trial that Finnigan's magnetic path was entirely through metal, but he asserted that that fact did not present a method or mode of operation different from plaintiff's. He stated it was purely a question or degree or quantity. I do not agree with that conclusion. Likewise, he admitted that in Finnigan's disclosed system the residual magnetism in the body of the locomotive or car did not induce a current in the coil—that the Finnigan system required a metal to metal contact. Further, Finnigan detector circuit is supplemented by a battery or source of outside energy for the circuit. This is not required under plaintiff's claims 7 and 11.

The Edison patent was also considered by the Board of Appeals. I quote from the Board's opinion: "The patent to Edison discloses a coil embedded between the rails of a railway track and connected through an electromagnet designed to operate a signal. For inducing a current in the coil, Edison proposed to subject its core, presumably a non-magnetic one, to the action of a magnet on a passing car so disposed as to pass in close proximity to the core. While it might have been possible to reverse the magnetized and unmagnetized elements, providing the coil with a magnetized core and the car with a body of iron, to modify the flux thus produced, the suggestion of such modification comes from the present application rather than from the patent or any pertinent prior art. Finnigan does use a permanent magnet in his coils but he does not teach that sufficient change in flux can be obtained without actually bridging the poles of the magnet."

The Edison patent called for the construction of a large permanent magnet underneath the tender or other part of the train "with its poles extending down between the rails near the ground". Underground electro-magnets were placed at suitable points between the rails in a moisture tight box so that "the poles of the magnet extend outside of the box above the surface of the ground, so as to be within a short distance from the poles of the magnet on the train when the latter passes over it". The Edison specifications also stated: "These signals are operated by current induced in the coils of the stationary magnets by the moving magnet on the train." The permanent magnet on the train is described as "a powerful permanent magnet." The concluding paragraph of the Edison specification is so general that it has little value as an anticipation argument. But this part of the Edison specifications is specific that for the claims he made he required two magnets, one (powerful) on the train and the other stationary between the rails, with their poles exposed, so that when the moving magnet on the train passes over and close to the stationary magnet between the rails, it will momentarily induce in the coils of the latter a current to operate the signaling device. At the point of closest proximity of the poles of the respective magnets, you have a closed magnetic circuit, with the two air gaps kept as small as possible, according to the specifications of plaintiff's patent, no installation is required on the automobile to operate the plaintiff's device. If Edison had taught that the passage of the train itself over a coil would induce a current in the coil that could be transmitted to the signaling device there might be some basis for the argument of anticipation. But Edison's patent required two things—a powerful magnet hanging from beneath a part of the train and a corresponding magnet in the roadbed, between the rails, so that the poles of each would be within a short distance of each other as the train passed rapidly over the stationary magnet. That was no anticipation of plaintiff's detector device, consisting of large rectangular loops of wire, disposed across or alongside the highway.

For reasons hereinafter developed, I wish to remark at this point that I do not agree with that part of the Board's opinion quoted above which expresses the view that plaintiff's application contained a suggestion that the conductor coil should have a magnetized core.

The Board's opinion concludes with the following observations:

"Of the references discussed the Clark disclosure doubtless most closely approaches that now claimed. This disclosure, which is in our opinion practically inoperative for the purpose intended, might be operative for appellant's purpose but we find no clear teaching in any of the art of record of placing such a system in the claimed environment for the appellant's purpose.

"Claims 51–53 are definitely limited to a combination which places a coil having interlinked lines of force in proximity to the path of automobile traffic. Probably Clark's apparatus would work in such an environment but, as above stated, we find no clear teaching that it might be so used. In our opinion claims 51, 52 and 53 define over the prior art in a patentable sense."

Defendant has also cited at the trial page 261 of Starling's book on "Electricity and Magnetism", 1924, 4th Edition. The device there illustrated—a pivotally mounted coil of wire connected to a galvanometer—is not shown as usable to detect the presence of a moving automobile.

None of the alleged anticipating patents had the essential factor of a disclosure of how to practice the patent in suit. The following quotation from Judge Learned Hand's opinion in Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F. 2d 986, at page 989, is pertinent: "No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation." See, also, cases cited in footnote of Judge Hand's opinion on pages 989 and 990 of 124 F.2d.

There have been other automatic vehicle-actuated devices, such as the system described in Engineering & Research Corp. v. Horni Signal Corp., 2 Cir., 98 F.2d 682, where the wheels of the passing car pressed down on a trip set in the highway and closed a circuit. But plaintiff's patent is

for an automobile detector of the electro-magnetic or magnetic type.

In the brief filed by defendant's counsel it is also argued that claim 7 "is fatally defective because it fails to include a coil". (See also defendant's answer to the 12th interrogatory.) Of course claim 7 is based on claim 1 and the "conductor in said circuit" is the coil therein mentioned. This is clear from a reading of the whole patent and from the testimony. Defendant's counsel also argues that claim 11 is "invalid on the ground of failing to particularly claim the invention because it includes no recitation of the magnetic or electrical conducting properties of the vehicle which are necessary to make a device of this sort operative". That goes to the theory of operation which is stated by the inventor in the specifications. Claim 10, on which Claim 11 is based, refers to the disturbances of the magnetic field "attending the passage of an automobile over the roadway".

Defense counsel also argues that all the claims are deficient in failing to point out the sensitivity required in the relay or other mechanism to permit operation by an automobile regardless of how the current is induced in the coil by the passage of an automobile over the coil. The relay used in the inventor's experiments and its sensitivity are minutely described on page 4, column 1, lines 15 to 34 of the printed copy of the patent in suit.

Another defense (lack of invention), based on the prior state of the art, was particularized by defendant in an answer to an interrogatory and listed twelve patents, of which all except two had been listed under the defense of anticipation. No evidence was offered at the trial on any of the listed twelve. Instead, defendant argued that the Edison patent for an improvement in railway signaling, the Finnigan patent for an improvement in train control, and the Clark patent for an improved burglar alarm, were illustrative of the prior are in analogous fields and that plaintiff in his invention of a traffic detector, relating to traffic control devices for highways traversed by automobiles, simply transferred bodily the devices of Edison, Finnigan and Clark, from the railroad-signal art and the burglar-alarm art, to the art of automobile traffic detection. I think that the railway-traffic and the highway-traffic signaling device fields are analogous. The state of the art of the one may be considered in determining the issue of invention involving a patent in the other. This was done in Engineering Research Corp. v. Horni Signal Corp., 2 Cir., 98 F. 2d 682, at page 685. For reasons hereinabove stated I believe that the Edison and Finnigan patents not only did not anticipate defendant's invention, but that as examples of the state of the art in railway-traffic signaling devices they do not establish any lack of invention in plaintiff's patented automobile traffic detector. It is a far cry from the teachings of those patents and the operation of the devices therein described, to plaintiff's invention and its application to the operation of highway traffic signals.

There is no close analogy between the field of burglar alarms and that of traffic signaling devices. Defendant argues that at best plaintiff has merely found a new use for an old device (the Clark burglar alarm) and that as such plaintiff has not produced what amounts to invention. Judge Learned Hand has discussed the limitations surrounding that argument. See, Gillman v. Stern, 2 Cir., 114 F.2d 28, 29, from which I quote as follows: "The first attack upon the patent is that it was merely for a new use of an old device. However, the only objection to patenting a new use is that the statute, § 31, Title 35, U.S. Code, 35 U.S.C.A. § 31, does not include 'uses' among what can be patented, except so far as they are included within 'arts'—i. e., processes. If, however, an old article must be physically changed, even slightly, to fit the new use, it becomes itself a new 'machine' or 'manufacture,' and the statute is satisfied. In that case the only question open is whether the discovery of the new use demands enough original thought to be deemed an invention. Constitutionally only 'discoveries' can be patented at all, and the ingenuity needed for the new conception, not the amount of physical readjustment, is the test of a valuable 'discovery.' Topliff v. Topliff, 145 U.S. 156, 163, 164, 12 S. Ct. 825, 36 L.Ed. 658; C. & A. Potts & Co. v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275; Rockwood v. General Fire Extinguisher Co., 2 Cir., 8 F.2d 682, 686; Gordon Form Lathe Co. v. Walcott, 6 Cir., 32 F.2d 55, 58."

Assuming that Clark's device for a burglar alarm could be physically changed and adapted to the new field of an electro-magnetic automobile detector, the degree of ingenuity in plaintiff's new use of it plus the

physical changes would be enough to establish his claim of invention.

The citation of no prior art in the actual field of electro-magnetically detecting the presence of a moving automobile is some indication that plaintiff's invention is a primary patent in that field. But the manner in which his invention was to be practiced, as disclosed by the specifications, does not cover defendant's device.

Defendant argues that the Letters Patent are invalid "because the specification and claims thereof did not describe the invention in full, clear, concise and exact terms such as would enable a person skilled in the art to practice the same". 35 U.S. C.A. § 33. This defense is explained in answer to plaintiff's interrogatory No. 11. Defendant states that this defense is made "because the specification and claims describe an apparatus which depends for operation on distortion of the earth's or other fixed magnetic field, whereas the operation of a device of the character described is dependent substantially entirely on the residual magnetism of the moving vehicle". Automobiles of the ordinary commercial designs are fundamentally and inherently magnetized. The coil of wire is the essential element in plaintiff's detector unit, according to the teaching of his patent. The detector unit is not intended to respond unless the automobile is in motion. In the specifications of the patent the inventor disclosed what he understood were the essential elements of his invention and how they operated. Whether or not he had the correct theory as to why they operated is not conclusive on the question of validity.

It may be that the earth's magnetic field or its disturbance has nothing to do with the induction of a current in the conductor coil in the highway. This inventor may have seen "nothing beyond his experiments" and may not have known "all the forces which he has brought into operation", but "if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor". Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 447, 55 L.Ed. 527.

"When a patent contains a sufficient disclosure of the claimed invention, it will not be invalidated either by the failure of the patentee to state the causes which produce the operation, or by a mistaken statement as to the reasons therefor." Hemolin Co. v. Harway Dyewood & Extract Mfg. Co., 2 Cir., 138 F. 54, 55.

"The patentee may not understand his own mechanism; but if he shows and describes it, and it produces a new result, the law is satisfied." Marconi Wireless T. Co. v. De Forest Radio T. & T. Co., 2 Cir., 243 F. 560, 563.

In another of its defenses, defendant alleges that the claimed invention is substantially different from that described in the original application—"in so far as the patent and particularly the claims in suit, purport to cover a device including a core". (Defendant's answer to plaintiff's 10th interrogatory.) What defendant means to say is that his device uses a coil conductor having a metal core, and that if plaintiff claims that defendant's device infringes, he is asserting a claim not supported by plaintiff's original patent application.

As I studied the file wrapper of plaintiff's application for the patent in suit, it became apparent that the specifications and drawings of the patent application did not disclose a conductor consisting of a comparatively small compact coil of wire with a core of iron or other metal. The type of conductor disclosed in the specifications and shown on the drawing was made of large sized loops of wire, substantially rectangular, disposed in various ways in the highway. Some of the sides of the loop were 3, 5 or 12 feet long—some with transverse legs—"made to extend more than half-way across the road". The conductor was to be "stretched across the path of the vehicle". The current induced therein by the moving automobile was described as "usually very weak". The means for using this weak current were either (1) to utilize it directly "to operate a galvanometer or other electrical instrument where 'registration' constitutes simply the conveyance of information to an observer" or (2) "it may be led through a sensitive relay and reinforced sufficiently to close an electric contact or perform any other function whatever". The specifications also stated: "In Fig. 12 I have shown diagrammatically the method of connecting the coil to a relay for the purpose of reinforcing the induced current." The applicant then went on to describe a practical test he made in which he used a "polarized relay".

It seems to me clear that what the specifications and drawings disclose and teach are (1) the use of a magnetic needle to detect and report to an observer the dis-

460

turbance or distortion of the earth's magnetic field by a moving automobile and (2) the use of a coil consisting of large loops of wire stretched across the path of the vehicle in such a way that the moving automobile will "according to the law of Faraday and Lenz" induce a current in the conductor.

At no place in the specifications or drawings is there any hint of the use of a conductor made up of a compact coil of wire wound around a center core of iron or other ferro-magnetic material having a high permeability of magnetism. The presence of such a core or bar of metal within the compact coil of wire would intensify greatly the current induced in the coil by a passing automobile. According to plaintiff's expert: "Any disturbing effect will make itself felt to a much higher degree because the original intensity is higher * * * As a result I can use a much smaller coil and get the same effect; the diameter can be reduced considerably, a hundred times or more."

In my opinion a compactly wound coil of wire with a core of iron or other ferro-magnetic material is a thoroughly different type of conductor from that described and explained in the drawings and specifications of plaintiff's patent.

■■■ Infringement cannot be found by comparison of the patent owner's commercial device, allegedly made under the patent, with the accused device. Harvey Hubbell, Inc., v. General Electric Co., 2 Cir., 267 F. 564; S. S. Kresge Co. v. Davies, 8 Cir., 112 F.2d 708, 709. The device made by plaintiff's licensee is not, in my opinion, covered by plaintiff's patent. The test is to interpret the claims of the patent in the light of its specifications and then see if the claims as thus interpreted read on the defendant's device.

■■■ When we consider Claims 1 and 10 of plaintiff's patent as issued, they must be read and interpreted in the light of the specifications. Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S. Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132. And when plaintiff attempts to read the claims of the patent on defendant's device, they must be so read in the light of what was actually disclosed by the specifications. Thompson v. Westinghouse Electric. &

Mfg. Co., 2 Cir., 116 F.2d 422; Weiss v. R. Hoe & Co., 2 Cir., 109 F.2d 722.

None of the plaintiff's experiments prior to filing his application for the patent used a compact coil of wire with a metal core, as the detector. The file wrapper, containing the affidavits submitted by applicant under Rule 75, 35 U.S.C.A.Appendix shows no such experiments. In fact, when the Examiner was first considering the application and expressed the view that plaintiff's device as disclosed was inoperative and was pointing out the difficulties that might be encountered, as he saw them if the coil was placed with its edges in a magnetic north and south line, the Examiner remarked (May 23, 1929) "there would be no change of flux whatever, regardless of the amount of iron inserted in the coil". To this the applicant, who is a patent attorney and supported his own patent application, made reply on September 29, 1929: "Applicant desires, first of all, to correct an error as to the phrase 'iron inserted in the coil'. Applicant did not disclose inserting iron in the coils, and did not find such a procedure necessary. The coil material may be iron, aluminum, silver, manganin, or any suitable conducting metal or alloy. But in his tests applicant used copper wire for the simple reason that this is the most commonly available insulated wire and the most popularly used for all sorts of electric wiring." I think it is clear that plaintiff was disavowing any disclosure of the use of "iron inserted in the coil".

In the long history of the application in the Patent Office, plaintiff filed, modified, cancelled and refiled a great number of claims, some 53 in all. Finally it got down to 14 claims. Nine of these the Examiner allowed. Five he disallowed. The applicant took an appeal to the Board of Appeals of the Patent Office on July 26, 1933. They sustained the Examiner in disallowing claims 48 and 49, but they overruled him on claims 51, 52 and 53, which the Board then allowed as claims 10, 11 and 12 of the patent in suit.

In connection with that appeal the Examiner made a "statement" on August 18, 1933, and pointed out that the claims rejected "* * * are broader than the invention since they include devices operable on still another construction and principle of detection due to disturbance of a magnetic field, and which are considered fully disclosed by the art. This construction and principle usually involves a rela-

tively small coil wound around an iron bar which may or may not be magnetized; and can probably be best explained by reference to certain of the references".

The Examiner then discussed the Edison patent, the Clark patent and the Finnigan patent and two others (page 144 of the File Wrapper) and added: "The type of field, whether an all embrace uniform field such as the earth's field, or a concentrated field, within a coil is immaterial so far as the rejected claims are concerned. Similarly, the principle of detection is immaterial so far as these claims are concerned. All types of constant fields and all principles of detection are embraced in the claims such as 48, 49, 51 and 53. Because of this, the rejected claims were denied the applicant as broader than the invention. A perusal of applicant's original disclosure impresses one with the fact that his main theme is the utilization of the disturbance of the earth's field for detecting purposes. The structures shown by the applicant are intended entirely for such detection. The rejected claims, however, cover detection with a coil having a concentrated field within it and a gradually decreasing field outside as disclosed in Edison, Finnigan and Clark. Finnigan shows even the 'utilization' of no sources of energy so that claims 48 and 52 are also included in the group."

Before the Board of Appeals the applicant attempted to justify the broad claims rejected by the Examiner. Applicant referred to that part of his specification which read: "While I have shown the utilization of the earth's natural magnetic field, it will be clear that the same may be reinforced by placing a permanent magnet or an electro-magnet in proximity to the road in such a manner as to reinforce the earth's field. In fact one may create an artificial magnetic field so strong as to render the earth's field negligible in comparison therewith." (Page 12 of the File Wrapper, lines 11 to 16.)

But that says nothing about winding the coil of wire around a core or bar of iron— or of inserting iron in the coil. On the contrary, all it teaches is that the earth's natural field may be reinforced by placing a permanent magnet "in proximity to the road". Just where it should be placed in relation to the coil, and that is the important point, is not disclosed. As the Examiner described the above quoted paragraph of the specifications, it was a "catch all statement" at best. He added: "In view of the specific disclosure this can be interpreted only to mean that the field is intended to be reinforced without changing the relationship of the field and coil, that is, the field will still be a uniform field both within and without the coil. No mention is made of concentrating the field within the coil". I agree with the Examiner's criticism.

The permanent magnet or electro-magnet, referred to in the line of the specifications on which plaintiff based his right to Claim 51, was not to be located in the road or on the road but "in proximity to the road". In Fig. 5 of the patent drawings the rectangular coil of wire is "buried in a vertical plane in the road"; in Fig. 6 it is "placed in a horizontal plane close to the surface of the pavement"; in Fig. 7 it is "placed in a vertical plane;" in Fig. 8 one of the transverse legs 22 is buried "at a distance of several feet below the surface of the pavement, say 3 to 5 feet, while the other leg 21 is placed flush or nearly flush with the surface of the pavement"; Fig. 9 shows the loop in the roadway about half the width of the road; Fig. 10 also shows large loops in the roadway. Figs. 14 to 17 show "further modifications in the method of installing the loop with respect to the road"—in Fig. 14 "in a vertical plane parallel to the road on one side thereof and as close to the road as possible without interfering with the traffic". "The height of the loop need not be more than 3 to 5 feet". In Fig. 15 "the loop is placed in a vertical plane as in Fig. 14 but one vertical leg of the loop 22 is further removed from the edge of the road than the opposite vertical leg 21". In Fig. 16 "a vertical plane coil is used as in Figs. 14 and 15, only it is turned substantially at right angles to the road". "Fig. 17 contains the features of both Fig. 5 and Fig. 14. The loop here is no longer in one plane, but partly in a horizontal and partly in a vertical plane". Fig. 18 shows "two loops on each street" in connection with a street intersection. All the loops shown or described are rectangular and are large. When the application speaks of a coil it means a loop of this type—"a rectangular coil of wire", Fig. 5; "a rectangular coil", Fig. 6; "a similar coil", Figs. 7 and 8; and in Figs. 14, 15, 17 and 18 it is referred to as a "loop". In Fig. 16 it is described as "a vertical plane coil". This rectangular coil or loop is the "conductor" of his invention.

The patent specifications taught only the use of a rectangular coil of large size and the various positions in which it could be placed—in, under, over or alongside the road. The distance between the legs of the rectangular coil seemed to be important to the applicant, for the reason that he got a direct E.M.F. induced in the transverse leg nearer the passing automobile and a reverse E.M.F. induced in the other parallel leg. His purpose seems to have been to get as little reverse E.M.F. in one of the legs as possible in comparison with the direct E.M.F. in the other, and not to have the reverse E.M.F. occur "simultaneously with the direct E.M.F." Referring to the rectangular coil of Fig. 6 the specifications state: "In practical tests I have obtained satisfactory results with coils of this type from 50 to 100 turns, and with a distance between the transverse legs varying from 5 to 12 feet." This same problem of the direct and reverse E.M.F. induced in opposite legs of the rectangular coil or loop is referred to in the description of Figs. 7, 15 and 16.

In a sworn report on his invention, dated August 31, 1928, and filed in the Patent Office July 21, 1933 (File Wrapper, pp. 123–128), the applicant described an experiment he made on March 4, 1928. He states:

" * * * I performed an experiment on March 4, 1928 using a coil of some 140 turns of annunciator, No. 18, copper wire attached directly to a portable galvanometer (Weston, St. Students Galvanometer, Model 375, No. 15999.) In a series of consecutive trials I varied the shape and area of the coil, from a collapsed loop with parallel sides touching each other to a rectangle of about 2 feet by 1½ feet and to a circle of about 2 feet in diameter."

"The best results were obtained with the higher speeds and with the coil shaped in the form of a rectangle with the two legs running cross-wise of the pavement as far apart as possible."

He also described another experiment of August 18, 1928, as follows:

"Two loops were used in this test, in three different ways. First I used the loop mentioned above in connection with my first experiment, in the form of a rectangle of about 2 feet by 1-1/2 feet. Next I used a big loop of about 54 turns of No. 18 copper wire, the loop being in the form of a rectangle about 4 feet by 5 feet, the narrower dimension running squarely across the road. Then I connected the two loops in series and used them together.

\* \* \* \* \* \*

"We have observed that with automobile speeds of 2 miles to 5 miles per hour, the smaller loop alone would operate to close the local circuit of the polarized relay. * * * When the large loop was used, either alone or in series with the smaller loop, the system would operate at automobile speeds between 5 and 25 miles inclusive. * * * Automobile speeds of 30 miles an hour or higher failed to operate the system."

"The failure of the system to operate with speeds of 30 miles an hour or higher is obviously due to the fact that the two legs of the coil which run crosswise of the road were too close together for such high speeds. An examination of the theory of my invention in the light of Faraday's Law and Lenz's Law relating to electro-magnetic induction brings forth the conclusion that when the axle of an automobile passes over the first cross-running leg of the loop it induces in the coil an E.M.F. in one direction, say clockwise, and starts the pointer of the relay in one direction, say to the right. When the axle passes over the other cross-running leg it induces an E. M.F. in the opposite direction, say counterclockwise and tends to move the pointer of the relay in the opposite direction, say to the left. If the time interval between the two successive pulses is too short to permit the pointer to close contact on the right, it will fail to close contact altogether. In the case of the large loop (5 feet) and a speed of 25 miles an hour, the time interval between successive impulses was only 3/22 (roughly, about 1/7) seconds. Therefore, operation failed when this interval was further reduced.

"This observation also suggests that if my system is installed in roads where speeds up to 50 miles an hour are used, the two cross running-legs of the loop should be about 10 to 15 feet apart. Alternatively, one of the legs may be buried in the pavement about 2 or 3 feet below the surface, or in general, about 2 or 3 times the distance between the other leg and the axle of a passing average vehicle. Also, the number of turns in the loop may be increased in order to increase the resistance of the main circuit and thus cut down the natural period of the relay, but without diminishing the voltage across its terminals."

The above clearly shows what the applicant considered as his "system" or "invention", shortly prior to filing his patent application on November 12, 1928. This explains, too, why the drawings and specifications show and describe only the large loops of wire, and make no mention of a compact coil of wire with an iron core. It also accounts for the applicant's frequent references in the specifications to direct and reverse E.M.F. induced in the two opposite transverse legs of the large rectangular wire loop or coil.

The first mention of any experiment by plaintiff with a tightly wound coil of wire around an iron core appears in certain affidavits of witnesses sworn to July 15, 1933 (File Wrapper, pp. 121, 122). But the affidavits very significantly fail to show the date when the applicant performed the experiments. Those affidavits were filed July 21, 1933, about six months after the Examiner's final report rejecting all but 9 claims of plaintiff's patent, on January 27, 1933. The applicant took an appeal from the Examiner's ruling on July 26, 1933, five days after he filed the affidavits about his experiments with a tightly wound coil of wire with an iron core. Evidently the submission of the affidavits of July 15, 1933, relating to said experiment, were intended by the applicant to bolster his case in view of the Examiner's ruling of January 27, 1933 (File Wrapper, p. 117), from which I quote the following: "Claims 48, 49, 51 and 53 are further rejected as broader than the invention. Applicant's invention utilizes the principle of joined conductors one influenced by the magnetic change to a lesser (or greater) extent than the other. Allowed claim 46 is typical of this. Claims 48, 49, 51, 52 and 53 are not limited to this but seek to embrace even the utilization of the principles of changing flux having equal effect on the turns of an entire coil which principle is utilized by practically every one of the references utilizing magnetism. It is submitted that the claims define nothing more than this old principle. (See claim 48 for example.) Furthermore, applicant's device as disclosed will not and cannot operate on this latter principle since the induced E, M, F's would necessarily cancel because the flux is not concentrated within the coil disclosed by applicant. The claims under rejection are not seen to be limited to any features, however, broadly recited, of the constructions shown by him in Figs. 5, 6, 7, 8, 14 and 15 as examples. Ex parte Stevens, 1926 C. D. 35." (Claim 46 of the application is Claim 8 of the patent as allowed.)

The Board of Appeals decided that: "Claims 51–53 are definitely limited to a combination which places a coil having interlinked lines of force in proximity to the path of automobile traffic." If I correctly read the opinion of the Board, they considered the Claims 51 to 53 as embracing a coil of wire with a magnetized core and they thought that the patent application had suggested its use as a conductor. It seems to me that the Examiner's view was the correct one and that the Board was wrong when they concluded that the patent application suggested the use of a coil of wire with a magnetized core. The records indicate that the applicant never had any such idea before he filed his application. If he had it would have been a simple thing to say so in the specifications or to show one in an additional figure of the drawings. He submitted 18 drawings which cover 3 printed pages of the patent as issued.

The applicant was working along entirely different lines as his early experiments clearly show. I believe he finally got the idea of a compact coil of wire with an iron core from what the Examiner wrote when rejecting his claims, although the applicant at first disavowed any such disclosure so as to avoid the charge of inoperativeness. I do not believe the applicant knew enough about the field in which he was working to develop an operative device, sufficiently reliable to make it commercially worth while.

Claim 51 was added to the application by a request filed in the Patent Office April 8, 1932. According to the applicant (p. 83 of File Wrapper) it was drawn "somewhat along the lines of former claim 38. It is, however, more specific in replacing the word 'conductor' by a coil of wire comprised of a plurality of loops, and further specifying the particular relation between the loops and a normally constant magnetic field surrounded by said loops. This claim is not limited to the earth's magnetic field, but is drawn to include a reinforced field or a purely artificial field. This claim is fully justified by and coextensive with applicant's original disclosure on page 12, lines 11 to 16." Applicant also contended: "Claim 52 is specific under claim 51, and is clearly allowable for the same reasons as claim 51."

Claim 38 had been added by the applicant August 8, 1931 (File Wrapper, p. 67). It reads as follows: "38. In combination

464

with a roadway designed for automobile type traffic, an indicator; an electric circuit; a conductor in said circuit, said conductor being situated in proximity to the path of the traffic in a normally constant magnetic field and in position to be traversed by the magnetic disturbance of said field normally attending the passage of an automobile over the roadway with a resultant induction of an electromotive force in said circuit; and means responsive to said electromotive force to operate said indicator." Evidently applicant had had a conference with the Examiner in advance, at which various new claims were considered, such as claim 39 which was eventually allowed as claim 1 of the patent as issued. However, the Examiner must have been opposed to claim 38 because the applicant requested that it be reconsidered. Applicant stated (File Wrapper, p. 71): "Claim 38 is similar to claim 39 except that a normally constant magnetic field is called for rather than specifically the earth's field. This claim the Examiners considered anticipated by the prior art. Its reconsideration is requested, however, since it is not believed that the prior art provides a legitimate anticipation or suggests the arrangement claimed."

The Examiner rejected claim 38 on February 13, 1932, as devoid of patentability because of the prior art as evidenced by patents cited by the Examiner. The applicant on April 9, 1932, asked that claims 38 and 50 be cancelled and he added three new claims—51, 52 and 53, which were later allowed by the Board of Appeals as claims 10, 11 and 12 of the patent in suit. In claim 51 the applicant attempted to specify "the particular relation between the loops and a normally constant magnetic field surrounded by said loops". He urged that as drawn it was not limited to the earth's magnetic field, but would "include a reinforced field or a purely artificial field". He asserted that the claim was fully justified by and coextensive with his original disclosure on page 12, lines 11 to 16 of his application, which has been hereinabove quoted. In my opinion these lines (11 to 16) clearly indicate that the reinforcing element was not to be within the loops but separate and apart from them, "in proximity to the road" to reinforce the earth's natural magnetic field. The physical or positional relationship of the reinforcing source (the magnet) in respect to the loops is not disclosed by the specifications. That it does not relate to the coil, but to a certain part or "zone" of the earth's magnetic field is further apparent from a statement, about 12 lines further down, which reads: "In the claims below where the phrase 'normal magnetic field' or its equivalent is used it should be understood to comprise both the normal natural magnetic field as well as the normal condition of an artificially maintained or artificially reinforced magnetic field in a given zone." This was added to the application on October 3, 1929 (p. 23 of File Wrapper).

A zone is an area of the earth's surface —"a well-defined tract of more or less belt-like form"—generally between parallel planes. That this was applicant's intended meaning of the word "zone" is evident from the fact that his first claim as filed read: "1. A device for detecting the passage of a vehicle through a given zone in a road including means sensitive to changes in the normal condition of a magnetic field."

On October 3, 1929, when applicant added the above quoted statement as to the meaning to be given to "normal magnet field", he asked that claim 1 be amended to read: "1. A device for detecting the passage of a vehicle through a given zone in a road including means sensitive to changes in the normal magnetic field in said zone." "Zone" meant a zone of the road, wherein the natural magnetic field was to be disturbed by the passing automobile. (See claim 8 of the patent.) That field could be reinforced "by placing a permanent magnet or an electro-magnet in proximity to the road". That was all the specifications taught in respect to the magnetic field and its reinforcement. And that teaching was directed to certain specifically described large rectangular loops or coils of wire, described in the specifications and shown in the drawings as variously placed in, beneath, over and alongside the road.

■ In my opinion the device described in the specifications and shown in the drawings of plaintiff's patent do not support a construction of claims 1 and 10, or claims 7 and 11, which would embrace within those claims a compact closely wound coil of wire of thousands of turns, surrounding an iron or ferrous-metallic core or bar. Claims 1 and 10, and likewise 7 and 11, must be limited to something like the device described in the specifications. It follows that defendant's device does not infringe any of said claims.

Plaintiff's licensee "never made any commercial use of a traffic detector having a large loop of wire without a core". Plaintiff's licensee did not comply with the

court's request that it furnish for the record in this case one of the actual devices built by the licensee under its license from plaintiff. I do not think "war conditions" or the fact that the licensee had only a few devices in stock is any excuse for not producing one for the record. However, the licensee submitted a sketch of its "M. K. Detector Coil Assembly" which shows a coil of wire about 12 inches long with a bar (a highly permeable metallic core) 17 inches long and two wire leads heading off to one end, one from each end of the coil.

The affidavits submitted by the respective parties describing experiments requested by the Court to ascertain the operativeness of a small coil of wire, without any iron core, as an automobile traffic detector have satisfied me that it is inoperative. The insertion of the iron core made the small coil of wire operative as an automobile traffic detector. If it were satisfactorily operative without the core I think it may be assumed that plaintiff's licensee would have built just the small coil of wire and omitted the metal core or bar. It would have been cheaper. Defendant's device uses small coils of wire of 75,000 turns with five strips of Alleghany "Mumetal" as a core. This combination of wire coil and Mumetal strips produces a device that is highly operative.

In the demonstrations given by plaintiff before the Board of Appeals of the Patent Office, the small coil of wire had an iron core. No demonstration was given before the Board of the operativeness of the small coil of wire without an iron core. The fact that, without the core, it might operate a few times is not sufficient. That would not be an operative device for the purpose for which it was to be used—to activate a traffic signal device. If it would not operate every time under certain given conditions, it would be a menace to traffic instead of an aid. It would lack practical utility and would be invalid. That was the ruling in two cases, one a patent for a voting machine that did not always register the votes, and the other for a calculating machine that sometimes failed to calculate. McKenzie v. Cumnings, 1904 C.D. 683, and Carlin v. Crumpton, 1916 C.D. 211.

If plaintiff's patent covered the use of a compact coil of wire with an iron core, defendant's device would infringe and defendant's tort would be inexcusable in view of the demonstration plaintiff gave defendant's vice-president. But plaintiff's conduct is only slightly less reprehensible. He never conceived the idea of using a conductor, consisting of a compact coil of wire with an iron core. His patent specifications and drawings do not even remotely suggest its use. Plaintiff's conductor was of a thoroughly different type. He got the idea of the compact coil and iron core from the Examiner's remarks, arguments and statements in passing upon the many claims, amendments, etc., during the period of almost five years that the application was under consideration in the patent office. The device plaintiff's licensee manufactures is not made according to the teachings of plaintiff's patent. Nor is the defendant's device so made. Hence if both devices are similar in many respects, it does not therefore follow that defendant's device infringes the plaintiff's patent. There is no infringement.

I am filing, together with this opinion, my findings of fact and conclusions of law. The complaint will be dismissed on the merits, with costs to the defendant. Submit proposed decree on two days' notice.